## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND

### (Baltimore Division)

| | | |
|---|---|---|
| In re: | * | |
| BALTIMORE AND CHARLES ASSOCIATES, LLC, | * | Case No.  10-17685-JS |
| | * | |
| Alleged Debtor. | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

### MEMORANDUM IN SUPPORT OF
### MOTION BY BALTIMORE AND CHARLES ASSOCIATES, LLC
### <u>TO DISMISS THE INVOLUNTARY PETITION</u>

Baltimore and Charles Associates, LLC, (hereinafter "Baltimore and Charles") by its undersigned counsel, hereby submits this Memorandum in Support of its Motion to Dismiss the Involuntary Petition filed by petitioning creditors James M. Jost & Company, Inc. ("Jost"), Dimensional Metals & Refinishing, Inc. ("Dimensional"), and Klima Electric Company, Inc. ("Klima") (collectively, "Petitioners").

### I.    <u>Introduction</u>

The dispute which gave rise to the filing of this involuntary petition arises out of the fact that Jost signed an AIA form of "design-build" contract with Baltimore and Charles (the "owner") for the renovation work on the historic B & O Building at 2 North Charles Street.  An essential element of an AIA design-build contract is that there is a "guaranteed maximum price" that the owner agrees to pay for the construction work which is designed and estimated by the builder, not the owner.  Once signed, the owner's duty is to pay the guaranteed maximum price and the design-builder's duty is to construct the project for the agreed price, or less.  Costs which

would cause the guaranteed maximum price to be exceeded are paid by the design-builder which is not entitled to reimbursement for them from the owner unless the owner agrees in writing to the changes.  Jost, the design-builder of the renovations at the B & O Building, claims that it spent almost $6.0 million more to renovate the building than it estimated when it designed the renovations and built them.  The guaranteed maximum price was almost $26 million and that been paid to Jost. Jost has demanded that the owner pay him an additional $6 million.  However, since the owner never agreed to written "change orders" increasing the guaranteed maximum price by $6.0 million, the owner has refused to pay anything more to Jost than the guaranteed maximum price and the approximately $1.0 million which is the additional amount of one written and signed change order..  The owner has paid Jost all that it is presently entitled to under the design-build contract.

Jost owes a large portion of the $6.0 million that it claims to contractors, subcontractors and materialmen, like Klima and Dimensional, and Jost cannot pay them.[1]  The entire reason for filing this involuntary petition is that Jost, and two of its subcontractors, are trying to use the stigma of the bankruptcy proceeding to pressure the owner to pay for Jost's mistakes in underestimating the costs of renovations for the Property and, thereafter, Jost's failure to obtain signed change orders from the owner for additional work.

The Court should dismiss the involuntary petition (the "Petition") because (1) Dimensional and Klima do not qualify as "creditors" under § 303(b) of the Bankruptcy Code and therefore there are not three petitioning creditors[2], as required by, and defined in, the Bankruptcy Code;  (2) if Klima and Dimensional do qualify as creditors, the claims that they assert are the subject of a bona fide dispute by Baltimore and Charles, as described herein and any undisputed

---

[1] Perhaps Jost needs to file its own voluntary bankruptcy to deal with its creditors.
[2] As set forth in the Affidavit of Benjamin J. Miller, attached hereto as Exhibit 1, Baltimore and Charles has more than twelve creditors which arise from the daily operation of the Hotel.  Exhibit 1 at ¶ 5.

amounts do not meet the statutory minimum; and (3) the claims of Jost all arise from one contract with Baltimore and Charles where Jost has been paid, in full except for the final draw which is the subject of a bona fide dispute, because Jost cannot produce lien releases, and therefore Jost does not qualify to be a petitioning creditor.    Moreover, all three petitioning creditors know that their claims are the subject of a bona fide dispute and they have given false oaths in the Petition.    Therefore, the Petition was filed in bad faith, Petitioners should not be given the benefit of § 303(c), and the Petition should be immediately dismissed.    Baltimore and Charles reserves the right to ask the Court, after dismissal of the Petition, to award it damages as permitted under 11 U.S.C. §303(i) including (i) attorney's fees, (ii) damages suffered by Baltimore and Charles because of the Petition and (iii) punitive damages.

## II.    Factual Background

Attached hereto as Exhibit 1 is the Affidavit of Benjamin F. Miller which verifies, under oath, the facts and matters stated herein.    Baltimore and Charles, a Maryland limited liability company, owns the fee simple interest and/or the leasehold interests in the land, and the historic building located thereon, at 2 North Charles Street, Baltimore, Maryland 21201 (the "Property"). Exhibit 1 at ¶ 4.    The Hotel Monaco Baltimore operates a hotel in the Property (the "Hotel") and there is a restaurant and several office tenants in the Property.    *Id*. at ¶ 5.    Baltimore and Charles has more than twelve undisputed, bona fide creditors whose claims arise from the operations of the Hotel and the office space in the Property.    *Id*.

On June 15, 2007, Baltimore and Charles, as owner of the Property, and Jost, as Design-Builder, entered into a "Standard Form of Agreement between Owner and Design-Builder" (the "Design-Build Agreement") to renovate and convert a portion of the Property into a Monaco brand hotel as detailed therein.    *Id*. at ¶ 6.    A true and correct copy of the Design-Build

Agreement is attached hereto as Exhibit 2 and incorporated herein by reference. The Design-Build Agreement provides, *inter alia*, that Jost would arrange for, and/or complete itself, a design for the renovation of the Property. *See* Exhibit 2. The Design-Build Agreement also contains a guaranteed maximum amount of approximately $25 million that would be paid to Jost, in installments or draw requests, for the work. *Id.* at §4.4. Petitioners Dimensional and Klima are not parties to the Design-Build Agreement themselves and any work that they might have performed on the Property could only be at the request of Jost. Exhibit 1 at ¶ 7. Their work, as detailed in their invoices, was not at the request of Baltimore and Charles. *Id.*

Jost had the legal obligation to pay all the contractors, subcontractors and/or materialmen for work that it requested them to do on the Property from the installments and/or draws from Baltimore and Charles. Pursuant to Section A.1.1.4 of Exhibit A to the Design-Build Agreement, Jost was permitted to employ contractors, subcontractors and materialmen as necessary to complete the renovation of the Property. Exhibit 2 at §A.1.1.4.

The renovation occurred and the Hotel Monaco opened for business in August, 2009. Exhibit 1 at ¶ 8. Under the terms of the Design-Build Agreement, the Project was to be substantially complete by April 2009. *Id.* Jost, however, did not obtain a certificate of occupancy for the Hotel until August 2009. *Id.* As a result of Jost's tardy completion of the Project, Baltimore and Charles suffered financial damages. *Id.* Baltimore and Charles is currently evaluating the extent and amount of such damages. *Id.*

Baltimore and Charles, and its agents, have carefully reviewed each and every invoice attached to the Petition. *Id.* at ¶ 9. The Dimensional invoices and the Klima invoices that are attached, and which are addressed to Baltimore and Charles, all relate to work that was required to be performed under the Design-Build Agreement. *Id.* at ¶ 10. The invoices are not for work

and/or services and/or supplies that were requested, authorized or approved by Baltimore and Charles, with two possible exceptions.[3]  *Id*. at ¶ 11.  As stated in Section A.1.1.4 of Exhibit A to the Design-Build Agreement, no direct contractual relationship exists between Klima and Dimensional with Baltimore and Charles.  Exhibit 2 at §A.1.1.4.  In fact, as specified in Section 1.1 of the Design-Build Agreement, it "shall not be construed to create a contractual relationship of any kind . . . between the Owner and a Contractor or Subcontractor."  *Id*. at §1.1.

Pursuant to Sections 4.1 and 4.4.3 of the Design-Build Agreement, Jost was entitled only to the Guaranteed Maximum Price and the Design-Builder's Fee.  Section 4.4.3.1 provides as follows:

> The sum of the Cost of the Work and the Design-Builder's Fee is guaranteed by the Design-Builder not to exceed twenty five million six hundred twenty eight thousand dollars ($25,628,000.00), subject to additions and deductions by changes in the Work as provided in the Design-Build Documents.  Such maximum sum is referred to in the Design-Build Documents as the Guaranteed Maximum Price.  <u>Costs which would cause the Guaranteed Maximum Price to be exceeded shall be paid by the Design-Builder without reimbursement by the Owner.</u>

*Id*. at §4.4.3.1 (emphasis added).

James M. Jost, president of Jost, has acknowledged in several meetings and telephone calls with representatives of investors in the Property, and also with the Property lender, Capmark Bank (the "Bank"), that the entire Guaranteed Maximum Price, Work Order No. 1, and the Design-Builder's Fee have been paid to Jost except for the "Final Payment," as defined in Section 5.5.1 of the Design-Build Agreement (the "Final Payment").  Exhibit 1 at ¶ 12.  Section 5.5.1 of the Design-Build Agreement conditions payment of the Final Payment upon compliance with Section A.9.10 of Exhibit A of the Design-Build Agreement.  Exhibit 2 at §5.5.1 and

---

[3] The Klima invoices numbered 11174 for $620 and numbered 11076 for $860 were for work directly requested by the Management Company for Baltimore and Charles.

A.9.10.   Section A.9.10 requires, *inter alia*, that Jost must provide releases and waivers from Jost's subcontractors and materialmen as a condition precedent to the Final Payment.   *Id*. at §A.9.10.   To date, Jost has not complied with Section A.9.10's requirements and Jost knows that it has not done so.   Exhibit 1 at ¶ 13.   Jost is not able to supply the required releases because it has not paid all of its subcontractors and materialmen.   *Id*.   In fact, in November, 2009, James M. Jost, in a telephone conversation with the Bank, attempted to convince the Bank to release the Final Payment to Jost even though Jost admittedly had not, and could not, supply the required releases and waivers.   *Id*. at ¶ 14.   The Bank refused to do so until Jost provided it with the required releases.   *Id*.   It could not be clearer that there is a genuine dispute about the Final Payment and whether it is due to Jost.   Other than the Final Payment, the entire Maximum Guaranteed Price, plus Work Order No. 1, has been paid to Jost.   *Id*.

On January 15, 2010, approximately nine months after the Certificate of Occupancy for the Hotel was obtained, Jost submitted to Baltimore and Charles, for the first time, a large, 10-inch stack of documents consisting of a series of alleged change orders with dates going back to 2007 and totaling almost $6,000,000 (approximately a 25% increase over the Guaranteed Maximum Price).   *Id*. at ¶ 15.   Of the almost $6.0 million in additional payments requested, almost one-third was represented to be cost overruns incurred by a subcontractor which is owned by Jost.   *Id*.

None of these change orders were previously sent to Baltimore and Charles and none had been signed by Baltimore and Charles as required under Section A.7.2 of Exhibit A to the Design-Build Agreement.   *Id*. at ¶ 16.   Baltimore and Charles gave them to its architect for review, after which their architect, in February, 2010, sent a letter to Jost demanding

explanations of the requested change orders.  Jost did not reply to Baltimore and Charles'
architects' letter in any manner.

With respect to change orders, Section A.7.2 of the Design-Build Agreement states as
follows:

> A Change Order is a written instrument <u>signed by the Owner</u> and
> Design-Builder stating their agreement upon all of the following:
>
> 1.     a change in the Work;
> 2.     the amount of the adjustment, if any, in the Contract
>        Sum; and
> 3.     the extent of the adjustment, if any, in the Contract
>        Time.
>
> <u>No course of conduct or dealing</u> between Owner and Design-
> Builder <u>shall establish the existence of a Change Order in the</u>
> <u>absence of a formal AIA Change Order form</u>.  For example, Owner
> acknowledged "tickets," payrolls, time cards, invoices, notices of
> change, change order requests, etc., are merely acknowledgments
> of the work performed therein and are not evidence that such work
> performed is/was outside of the scope of Work required by the
> Design-Build Documents and therefore included in the GMP.

Exhibit 2 at §A.7.2 (emphasis added).

Baltimore and Charles informed Jost in January, 2010, when it was first presented with
the Change Orders, that it did not agree to the alleged change orders, and that since Jost had not
complied with the terms of the Design-Build Agreement, Baltimore and Charles was not legally
obligated to pay the additional amounts claimed.  Exhibit 1 at ¶ 17.  In response, Jost alleged that
the changes were approved by Jost's project architect, William M. Collins, III of Collins and
Kronstadt, and that such approval was legally sufficient.  *Id.*  Jost also argued that the change
orders had been informally and verbally approved. Baltimore and Charles disagrees with this
contention.  It is absolutely clear in the Design-Build Agreement that enforceable change orders
must be signed by Baltimore and Charles or by the architect for Baltimore and Charles.  The
Design-Build Agreement, as quoted above, expressly negates any argument that informal, verbal

change orders are enforceable. Section 7.4 of the Design-Build Agreement specifically provides that the only parties authorized to sign the required written instrument authorizing a change in the work of the Project are Baltimore and Charles or its "Designated Representative," David Polatnick of PZ Architects, LLC. Exhibit 2 at §7.4. Neither Baltimore and Charles nor Mr. Polatnick signed the change orders that Jost claims increased the Guaranteed Maximum Price. Exhibit 1 at ¶ 16. Moreover, Jost agreed in a "Contractor's Consent to Assignment of Contractor's Agreement," that it was required to obtain the Bank's written consent before performing "work pursuant to any change order." *Id.* Upon information and belief, Jost did not obtain written consent from the Bank prior to performing services pursuant to the change orders. *Id.*

In one instance, Baltimore and Charles did agree to additional work on the Property. *Id.* at ¶ 19. In Work Order No. 1 dated May 5, 2009, Baltimore and Charles and Jost followed the requirements of the Design-Build Agreement and executed a binding change order. *Id.* A true and correct copy of Work Order No. 1 is attached hereto as Exhibit 3 and is incorporated herein by reference. The additional work that was agreed to in Work Order No. 1, which cost almost an additional $1.0 million, was paid in full by Baltimore and Charles by a wire transfer dated May 5, 2009, the same day that the additional work was approved. *Id.* at ¶ 20. A true and correct copy of the Wire information is attached hereto as Exhibit 4 and is incorporated herein by reference. As demonstrated by the procedure followed for Work Order No. 1, both Jost and Baltimore and Charles knew the required procedure to be followed for Jost to be paid an additional amount for additional work. In that one instance, the proper papers were signed by the parties, approving additional work and additional payment for the work. Baltimore and Charles then paid Jost promptly. Since Jost clearly knew the procedures to be followed for Work Order

No. 1, and followed them, Jost can hardly be heard to complain now that additional sums are due to it for additional work when no additional work orders have been duly signed.

On or about February 5, 2010, Jost filed a complaint in the Circuit Court for Baltimore City (Case No. 24-C-10-001122) (the "Lien Action") seeking a mechanic's lien for approximately $6 million[4] in additional charges for work on the renovations.[5]  *Id*. at ¶ 21.  The complaint was served upon Baltimore and Charles on March 17, 2010.  *Id*. at ¶ 22.  On or about April 8, 2010, before Baltimore and Charles had an opportunity to answer the complaint and file its counterclaims, the Petitioners filed the Petition thereby staying Jost's Lien Action.  *Id*. at ¶ 23.

### III.    <u>Argument</u>

The Court should dismiss the involuntary petition because: (1) Dimensional and Klima do not qualify as "creditors" under § 303(b) of the Bankruptcy Code and therefore there are not three petitioning creditors[6], as required by, and defined in, the Bankruptcy Code;  (2) if Klima and Dimensional do qualify as creditors, the claims that they assert are all the subject of a bona fide dispute by Baltimore and Charles, as described herein, and any undisputed amounts do not meet the statutory minimum; and (3) the claims of Jost all arise from one contract, with Baltimore and Charles where Jost has been paid, in full, except for the final draw which is the subject of a bona fide dispute because Jost cannot produce lien releases, and therefore Jost does not qualify to be a petitioning creditor. Moreover, all three petitioning creditors know that their claims are the subject of a bona fide dispute and they have given false oaths in the Petition.

---

[4] It should be noted that Jost claims to be owed only $600,000 in the invoices that it attached to the Petition. However, Baltimore and Charles maintains that nothing is due to Jost and that Jost is liable to Baltimore and Charles for damages to Baltimore and Charles for the late completion of the work.
[5] A number of subcontractors also filed mechanic's lien actions, but Dimensional and Klima did not.
[6] As set forth in the Affidavit of Benjamin J. Miller, attached hereto, Baltimore and Charles has more than twelve creditors which arise from the daily operation of the Hotel.

Therefore, since the Petition was filed in bad faith, Petitioners should not be given the benefit of

§ 303(c) and the Petition should be immediately dismissed

      **A.**      **Neither Dimensional Nor Klima Qualify As Creditors Under § 303(b)**

Section 303 of the Bankruptcy Code governs the commencement of an involuntary case

under Title 11.  More specifically, §303(b)(1) sets forth who may qualify to file an involuntary

petition:

> An involuntary case against a person is commenced by the filing
> with the bankruptcy court of a petition under chapter 7 or 11 of this
> title—
>
> > (1) by three or more entities, each of which is either a
> > holder of a claim against such person that is not contingent
> > as to liability or the subject of a bona fide dispute as to
> > liability or amount . . . [which] claims aggregate at least
> > $13,475 more than the value of an lien. . .

11 U.S.C. §303(b)(1).

The burden rests on the petitioning creditors to establish that they are qualified under §

303(b)(1).  *In re DSC, Ltd.*, 486 F.3d 940, 944-45 (6th Cir. 2007) (citing *In re Eastown Auto Co.*,

215 B.R. 960, 968 (6th Cir. 1998)).  To proceed, at least three entities must hold a claim against

Baltimore and Charles that is **not** contingent as to liability and is **not** the subject of a bona fide

dispute as to liability or amount.  *Id.*  In order to have a claim against a debtor, the petitioning

creditor must demonstrate that it has a direct obligation of payment from the debtor and not

merely a derivative claim against the debtor.  *In re Utilimax.Com, Inc.*, 265 B.R. 63 (Bankr. E.D.

Pa. 2001) (finding that purported creditors' claims were derivative of interconnection company's

claim against debtor and thus did not satisfy threshold requirement of holding a claim against the

debtor per § 303(b)).

An entity has a claim against the debtor if events occurring prior to the filing of the involuntary petition create a relationship, such as a contract or privity, between the petitioning creditor and the debtor.  *See In re Piper Aircraft, Corp.* 58 F.3d 1573, 1577 (11th Cir. 1995); *see also In re Lepri*, 49 F.2d 472 (W.D. Pa. 1931) (dismissing involuntary petition due to lack of privity of contract between the debtor and any one of the petitioning creditors).  In general, an owner-debtor owes no direct duty to a subcontractor because there is no contractual relationship between the two parties.  *See generally, In re Medina*, 413 B.R. 583, 597-98 (Bankr. W.D. Tex. 2009).  In *In re James Plaza Joint Venture*, 67 B.R. 445, 447 (Bankr. S.D. Tex. 1986), the court held that a structural engineer and a subcontractor in charge of mechanical, electrical and plumbing, were not proper petitioning creditors because these parties were subcontractors of the architect, who was the only party in privity. Accordingly, their claims were not "separate and distinct" from the architect's claim.  *Id.*  In making this finding, the court found it significant that both parties looked to the architect for payment and that no written or oral contract existed between these parties and the debtor.  *Id.*

Thus, because there is no privity of contract, a subcontractor does not have a direct claim against the owner-debtor and does not qualify as a petitioning creditor under § 303(b).  *See In re Barrett*, 39 B.R. 792, 794-95 (Bankr. D. Minn. 1984) (generally, unless a subcontractor has established a mechanic's lien, a subcontractor has no right to recovery from the owner absent a contractual relationship); *In re T. Brady Mechanical Services, Inc.*, 133 B.R. 441, 446 (Bankr. N.D. Ill. 1991) (stating that absent a statutory mechanic's lien, a subcontractor has no right of action against the owner of the property).  Under Maryland law, without an established mechanic's lien, subcontractors "have no direct contractual relationship with the owner and

therefore cannot otherwise subject the owner's property or assets to the payment of their claims." *Arfaa v. Martino*, 404 Md. 364, 378 (2008).

Here, Dimensional and Klima are not creditors because the work they performed on the Project was not contracted for by Baltimore and Charles and could only have been authorized pursuant to the Design-Build Agreement between Baltimore and Charles and Jost. Jost apparently retained both Dimensional and Klima to perform specific tasks on the Project. Although Baltimore and Charles cannot state whether the work in the invoices was ever completed or whether it may have been paid to Jost in a draw request, Baltimore and Charles can state that neither Dimensional nor Klima have a contractual relationship with Baltimore and Charles, with the exception of the two small Klima invoices. In fact, the Design-Build Agreement specifically states, in Section 1.1, that the agreement "shall not be construed to create a contractual relationship of any kind . . . between [Baltimore and Charles] and a Contractor or Subcontractor." The invoices that Dimensional and Klima attached to the Petition are for services allegedly rendered in connection with the Project. Those invoices were to be paid from the Guaranteed Maximum Price, which was paid to Jost. Absent a legally binding change order, if the Guaranteed Maximum Price is not sufficient, such invoices must be paid by Jost. Baltimore and Charles did not separately contract for those services or agree to a change order agreeing to pay separately for those services. Accordingly, it is indisputable that Dimensional and Klima, both of whom were subcontractors retained by Jost, have no privity of contract with Baltimore and Charles and thus no direct claim against Baltimore and Charles. Their only claim is against Jost which was paid the Guaranteed Maximum Price and which now must pay its subcontractors.

Moreover, neither Dimensional nor Klima have established a mechanic's lien, or even given notice of their intent to seek such a lien, that, if established, might give them a claim to the

property of Baltimore and Charles.  Instead, Jost filed an action for a mechanic's lien that included the amounts now claimed by Dimensional and Klima.  As the court recognized in *In re James Plaza Joint Venture*, 67 B.R. 445, since Dimensional and Klima's claims as subcontractors are not "separate and distinct" from Jost's claims as the general contractor, they do not have claims against the alleged debtor, Baltimore and Charles. Furthermore since neither has an established mechanics' lien against the Property, the case law holds that they are not creditors of Baltimore and Charles. Accordingly, Dimensional and Klima are not "creditors" of Baltimore and Charles and lack standing to file the Petition.

### B.    Petitioners' Claims Are the Subject Of Bona Fide Disputes

Under § 303(b), after a petitioning creditor has established that it has a claim against the alleged debtor (which neither Klima nor Dimensional has done), there is a second criteria that the creditor must also satisfy. The petitioning creditor's claim is not "qualified" if it is the subject of a "bona fide dispute" as to liability or amount.  11 U.S.C. 303(b)(1).  Although the Bankruptcy Code does not define "bona fide dispute," the Fourth Circuit has held that a bona fide dispute exists when there is "'an objective basis for either a factual or a legal dispute as to the validity of the debt.'" *Schlossberg v. Byrd (In re Byrd)*, 357 F.3d 433, 437 (4th Cir. 2004) (quoting *Matter of Busick*, 831 F.2d 745, 750 (7th Cir. 1987); *see also Atlas Mach. & Iron Works, Inc. v. Bethlehem Steel Corp.*, 986 F.2d 709, 715 (4th Cir. 1993) (holding that a bona fide dispute "entails some sort of meritorious, existing conflict").  In other words, a claim is subject to a bona fide dispute if there is either a genuine issue of material fact that bears upon the debtor's liability, or a meritorious contention as to the application of law to undisputed facts.  *In re DSC, Ltd.*, 486 F.3d at 945 ((citing *In re Eastown Auto Co.*, 215 B.R. at 965) (quoting and citing *In re Lough*, 57 B.R. 993, 997 (Bankr. E.D. Mich. 1986))).  In making this determination, "[t]he bankruptcy

court need not resolve the merits of the bona fide dispute, but simply determine one exists." *Byrd*, 357 F.3d at 437.

The reasoning behind the objective standard for determining if there is a bona fide dispute is that "[t]he legislative history makes it clear that Congress intended to disqualify a creditor whenever there is any legitimate basis for the debtor not paying the debt, whether that basis is factual or legal.  Congress did not intend to require a debtor to pay a legitimately disputed debt simply to avoid the stigma of bankruptcy." *In re Lough*, 57 B.R. at 997; *see also In re DSC, Ltd.*, 486 F.3d at 945; *In re BDC 56 LLC*, 330 F.3d at 117.  In an involuntary bankruptcy proceeding, the initial burden rests on the petitioning creditors to establish a prima facie case that no bona fide dispute exists as to the debts.  *Byrd*, 357 F.3d at 437.  Only after this prima facie case is established, the burden shifts to the alleged debtor to demonstrate the existence of a bona fide dispute.  *Id*. at 439.

### 1.    Jost's Claims Are the Subject of Bona Fide Disputes

Jost's claims are the subject of at least four bona fide disputes: (1) Baltimore and Charles has paid all amounts currently due under the Design-Build Agreement; (2) under the unambiguous terms of the Design-Build Agreement, Jost is not entitled to any amount in excess of the Guaranteed Maximum Price and the Design-Builder's Fee; (3) Jost potentially misapplied funds paid by Baltimore and Charles that should have been paid to subcontractors; and (4) Jost's claims are subject to Baltimore and Charles' setoff and/or recoupment claims based on the untimely completion of the Project.

### a.    Baltimore and Charles Have Paid the Amounts Currently Due Under the Design-Build Agreement

The invoices Jost attached to the Petition all relate to work that Jost allegedly performed on the Project. Pursuant to Sections 4.1 and 4.4.3 of the Design-Build Agreement, Jost was

entitled only to the Guaranteed Maximum Price and the Design-Builder's Fee. Exhibit 2 at §§4.1 and 4.4.3. As James M. Jost, president of Jost, has acknowledged in several meetings and telephone calls with Messrs. Mayer and Miller, as well as with the Bank, the entire Guaranteed Maximum Price and the Design-Builder's Fee have been paid to Jost except for the Final Payment. *See* Exhibit 1 at ¶¶ 12, 14.

The Final Payment is not yet due because Jost has not complied with Section A.9.10 of Exhibit A to the Design-Build Agreement. Section A.9.10.2 states unambiguously that Jost is only entitled to be paid the Final Payment, including any remaining retained percentages, when Jost provides, *inter alia*, releases and waivers from all subcontractors and suppliers. Exhibit 2 at §A.9.10.2. It is undisputed that Jost has not complied with this requirement. *See* Exhibit 1 at ¶ 13. Indeed, in November 2009, James Jost, in a telephone call with the Bank, tried to convince the Bank to release the Final Payment to Jost even though Jost admittedly could not supply the required releases and waivers. *Id*. at ¶ 14. Thus, there is at least a bona fide dispute as to whether Baltimore and Charles currently owes any funds to Jost under the Design-Build Agreement.

### b. Jost is Not Entitled to Any Amount in Excess of the Guaranteed Maximum Price and the Design Builder's Fee

There is also a bona fide dispute regarding Jost's claim to payments in excess of the Guaranteed Maximum Price and the Design-Builder's Fee. On January 15, 2010, Jost submitted to Baltimore and Charles, for the first time, at least 10 inches of paperwork purporting to support Jost's contention that it was entitled to amounts in excess of the Guaranteed Maximum Price. *Id*. at ¶ 15. The submittal consisted of a series of alleged change orders going back to 2007. *Id*. None of those change orders were previously sent to Baltimore and Charles and were not signed by either Baltimore and Charles or its authorized architect. *Id*. at ¶ 16. The alleged change

orders amounted to a total increase of almost $6 million, approximately a 25% increase over the Guaranteed Maximum Price. *Id*. at ¶ 15. Baltimore and Charles promptly responded to Jost that it had not approved, and was not liable for, any of the purported change orders. *Id*. at ¶ 17. Jost has neither produced signed versions of any of these change orders (because none exist) nor provided any additional evidence that Baltimore and Charles approved these changes.

Under the clear and unambiguous terms of the Design-Build Agreement, Baltimore and Charles is not liable for the unapproved change orders. Section A.7.2 of Exhibit A to the Design-Build Agreement provides that all change orders must be "signed by the Owner" and that "[n]o course of conduct or dealing between Owner and Design-Builder shall establish the existence of a Change Order in the absence of a formal AIA Change Order form." Exhibit 2 at §A.7.2. Thus, there is at least a bona fide dispute as to whether Baltimore and Charles owes any additional amount to Jost above the Guaranteed Maximum Price absent signed change orders.

> **c.** **Baltimore and Charles Made Payments to Jost that Were Not Properly Paid to Subcontractors**

Upon information and belief, Jost has misapplied funds paid by Baltimore and Charles that should have been used to satisfy the claims of subcontractors and suppliers. *See* Exhibit 1 at ¶ 24. Jost's failure to properly disperse payments to subcontractors violates Section 9-202 of the Real Property Article of the Code of Maryland and reduces any amount allegedly due to Jost under the principles of set-off and recoupment. Given the fact that Baltimore and Charles has paid the Guaranteed Maximum Price (save for the Final Payment) and the large number of unpaid subcontractors, it is likely that Jost misapplied at least a portion of the payments from Baltimore and Charles. Factual questions as to whether Jost misapplied and/or misappropriated funds present yet another bona fide dispute regarding Jost's allegation that it is owed additional payments from Baltimore and Charles.

> **d.      Baltimore and Charles has Setoff and Recoupment Claims Based on Jost's Tardy Completion of the Project**

Jost's claims are subject to valid setoff and/or recoupment claims by Baltimore and Charles based on the untimely completion of the Project.  Under the terms of the Design-Build Agreement, the Project was to be substantially complete by April 2009.  Exhibit 1 at ¶ 8.  Jost did not obtain a certificate of occupancy for the Hotel until August 2009.  *Id*.  As a direct and proximate result of Jost's tardy completion of the Project, Baltimore and Charles suffered financial damages.  *Id*.  Baltimore and Charles is currently evaluating the extent and amount of such damages.  *Id*.  If Jost is eventually able to prove the additional amounts allegedly owed by Baltimore and Charles (which is highly unlikely), its recovery will be reduced by the amount of damages caused by the late completion.  While, to date, Baltimore and Charles has not precisely calculated it damages, the damages will most likely exceed the approximately $620,000 that Jost claims in the Petition.  *Id*.  Thus, Jost's claims are not only the subject of a bona fide dispute relating to Baltimore and Charles setoff and recoupment claims, but Jost's claims will likely be wiped out by the setoff and recoupment claims.

> **2.      Dimensional and Klima's Claims**

As discussed in Section III.A., *supra*, Baltimore and Charles contends that neither Dimensional nor Klima has a contractual relationship with Baltimore and Charles.  The fact is that Dimensional and Klima are subcontractors hired by Jost to perform services under the Design-Build Agreement.  In the Lien Action, filed by Jost, Jost included in Exhibit F, which is 24-inches of papers attached to the complaint, most, if not all, of the invoices that are attached to the Petition for Dimensional and Klima.  In the Lien Action Jost admitted that all of the work described in Exhibit F is work that Jost contracted with subcontractors to do pursuant to the terms of the Design-Build Agreement.  To the extent that Dimensional and/or Klima contend that

the services rendered were not in connection with the Design-build Agreement, Baltimore and Charles did not authorize these services nor agree to pay Dimensional and Klima for such services. *See* Exhibit 1 at ¶¶ 9-11. Based on the descriptions of the work performed that are contained in the invoices attached to the Petition, the services described are work that was to be performed by Jost pursuant to the Design-Build Agreement. *Id.* If the services and/or work performed was not pursuant to the Design-Build Agreement, Baltimore and Charles denies that it retained Dimensional or Klima to do such work. Therefore, Baltimore and Charles denies any liability to pay for any services even if the services were outside the scope of the Project (which they were not), hence, there is at least a bona fide dispute as to whether Baltimore and Charles authorized or agreed to pay for these services rendered by Dimensional or Klima.

### C.    Petitioners Should Not be Given the Chance to Correct the Defective File Because it was Filed in Bad Faith

A defective petition may be dismissed without granting the petitioner an opportunity to correct the defect if the petitioner filed it in bad faith. *Atlas Machine & Iron Works v. Bethlehem Steel Corp.*, 986 F.2d 709, 716 (4th Cir. 1993) (citing *In re Crown Sportswear, Inc.*, 575 F.2d 991, 993 (1st Cir. 1978). "To determine bad faith, a court examines whether a reasonable person would have filed the petition (objective test) as well as the motivations of the petitioners (subjective test)." *Id.* In addition, under § 303(i), an alleged debtor is entitled to attorney's fees, compensatory damages, and punitive damages if a petition is filed in bad faith.

Courts have considered a variety of factors in their efforts to determine whether a petitioning creditor has acted in bad faith, such as whether a petitioning creditor evidenced an intent to vex or oppress, *see e.g., In re Howard, Neilson & Rush, Inc.*, 2 B.R. 451, 453 (Bankr. M.D. Tenn. 1979); was ill advised, motivated by spite, malice or a desire to embarrass the debtor, *see e.g. Camelot v. Hayden*, 30 B.R. 409, 411 (E.D. Tenn. 1983); was filed to invoke a

customary collection proceeding, *see e.g. In re Tarisi & Tighe*, 88 B.R. 706 (Bankr. W.D. Pa. 1988); *In re SBA*, 13 B.R. 99, 100 (Bankr. S.D. Fla. 1981) (court determined that petitioners were using involuntary proceeding as substitute for debt collection procedures); or where the petition did not promote an interest contemplated by the Code, *see In re Laclede Cab. Co.,* 76 B.R. 687, 693 (Bankr. B.D. Mo. 1987).  Debt collection is *not* a proper purpose of bankruptcy. *In re Caucus Distribs.*, 106 B.R. 890, 924 (Bankr. E.D. Va. 1989).

Bankruptcy Rule 9011 provides that a signature of an attorney or a party constitutes a certificate that the signing party has read the document and that, to the best of the attorney's or party's knowledge, information and belief formed after reasonable inquiry, it is well grounded in fact and is warranted at law and that it is not interposed for any improper purpose, such as to harass, to cause delay or to increase the cost of litigation.

Here, Jost filed the Petition knowing that its claims were the subject of bona fide disputes.  Baltimore and Charles, on numerous occasions, unequivocally told Jost that it adamantly contested whether Jost was entitled to any money in excess of the Guaranteed Maximum Price and that it never agreed and was not obligated to pay under the purported change orders submitted by Jost after the fact.  Exhibit 1 at ¶ 18.  Not only did Jost and his counsel sign the Petition in accordance with Rule 9011, James Jost also submitted an affidavit in which he stated under oath as follows: "The amount claimed to be due and owing are not contingent and are not the subject of a bona fide dispute."  This statement was false when made, and thus was submitted in bad faith.  In addition to knowing that there was a bona fide dispute, Jost also knew that under the clear and unambiguous terms of the Design-Build Agreement, the Final Payment was contingent upon the release and waiver of all liens by subcontractors, which

Jost knew had not been achieved.  *See* Exhibit 1 at ¶ 14; Exhibit 2 at §§ 5.5.1 and A.9.10.  Jost's knowingly false statements under oath were made in bad faith.

Moreover, the Petitioners filed the Petition for the improper purpose of collecting a debt. Jost, Dimensional, and Klima, by filing the Petition, are wrongfully attempting to collect amounts purportedly owed to them and to put themselves in a better position than other creditors. Prior to filing the Petition, Jost had filed the Lien Action seeking a mechanic's lien and more than $6.0 million in compensatory damages.  Before Baltimore and Charles had an opportunity to answer the complaint and file its counterclaims, Jost and two of its subcontractors, Dimensional and Klima, filed the Petition.   Apparently, after filing the complaint, Jost determined, for whatever reason, that it would be easier to collect (or force a settlement) of the amounts it incorrectly alleges Baltimore and Charles owes it, by initiating an involuntary bankruptcy.  This use of the Bankruptcy Act is inappropriate and must be rejected by this Court as a bad faith filing.

### IV.    Conclusion

For the foregoing reasons, the alleged debtor, Baltimore and Charles Associates, LLC respectfully requests that this Court dismiss the Petition.[7]  Moreover, upon dismissal, Baltimore and Charles will submit a motion and memorandum under § 303(i) for its attorney's fees, compensatory damages, and punitive damages based on the bad faith filing.  Baltimore and

---

[7] While Baltimore and Charles maintains that the involuntary petition filed by the Petitioners is not properly grounded in the law, it reserves it rights under §706 to consent and to convert to Chapter 11 as part of  future discussions or negotiations with parties holding valid claims.

Charles also reserves it right to request that the Court order the Petitioners to post a bond under §

303(e) to indemnify it against such amounts as the Court may allow under § 303(i).

Respectfully submitted at Baltimore, this 30th day of April, 2010.


      /s/   *Deborah H. Devan*
Deborah H. Devan, Federal Bar No. 01479
Thomas M. Wood, IV, Federal Bar No. 00365
Neuberger, Quinn, Gielen, Rubin & Gibber, P.A.
One South Street, 27th Floor
Baltimore, Maryland  21202-3282
 (410) 332-8550
dhd@nqgrg.com

Attorneys for Baltimore and Charles Associates, LLC