UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(BALTIMORE DIVISION)

In re:

BALTIMORE AND CHARLES
ASSOCIATES LLC

) Case No. 10-17685 -JS
) Chapter 7

## MEMORANDUM IN SUPPORT OF OPPOSITION TO MOTION TO DISMISS THE INVOLUNTARY PETITION

James M. Jost & Company, Inc., Klima Electric Company, Inc. ("Klima Electric"), Dimensional Metals & Refinishing, Inc. ("Dimensional Metals"), and Clevenger Corporation (collectively "Petitioning Creditors") by their undersigned counsel hereby file their Memorandum in Support of their Opposition to the Motion to Dismiss the Involuntary Petition filed by Baltimore and Charles Associates, LLC ("B&C").

I.   FACTUAL BACKGROUND

B&C are the owners of property located at 2 North Charles Street ("Property") formerly known as the B&O Building. The Property includes office space, the Hotel Monaco operated by Kimpton Hotel & Restaurant Group, LLC, and a restaurant, the B&O American Brasserie. The Petitioning Creditors are the general contractor (James M. Jost & Co., Inc. ("Jost")) and subcontractors (Klima Electric, Dimensional Metals) who in addition to the work done as subcontractors also performed work directly at the request of B&C or Kimpton representatives (acting as B&C's agent) or entered into a separate agreement for the work performed (Clevenger Corporation).

The most senior person involved in this transaction for B&C, Hal Wheeler, passed away on January 25, 2010. Before his death, he acknowledged to James M. Jost and others the increased scope of work performed by Jost, its subcontractors and suppliers. He stated that

preparation of change orders would put B&C in default with Capmark Bank ("Capmark") and might cause Capmark to stop funding. As a representative of B&C, he affirmed and promised to pay for the additional work through additional financing through another source. *See* Affidavit of James M. Jost, dated May 14, 2010, attached as Exhibit A at ¶¶ 3-5.

  B&C based its Motion to Dismiss not on objections to the quality of work, or amount of work done, but on the specious argument that Jost's claim is limited to the guaranteed maximum price in the original Design Build contract. This is simply false. B&C ignores the changed scope of work on the project. The changed scope of work included, but is not limited to, using union labor, rehabilitating the masonry parapet, doubling the seating size of the restaurant on the Property, additional HVAC work, and additional electrical work. This increased and changed scope of work was acknowledged by B&C on many occasions. B&C owes approximately $6,000,000 for work performed in the renovation of the Property pursuant to a Design Build contract for the original scope of work performed by the contractors as well as the additional, changed scope of work that was accomplished at the Property at the direction of the owner, B&C.

  A review of correspondence between Jost and B&C demonstrates that the parties agreed that there was an increased scope of work, that a significant amount of money (approximately $5.275 million) was due and owing at that time, and that there would need to be additional funding found by B&C to pay for the outstanding amounts due and owing Jost and its subcontractors. *See* e-mail and attached line item committed budget from Tony Del Balzo to Hal Wheeler, John VonNeiff and Jack Finney of B&C dated November 9, 2009 attached as Exhibit B.

DB04/839306.0002/2764120.1 PF06

Benjamin Miller, who signed the affidavit in support of the Motion to Dismiss, was not at the Property on a regular basis (at most once a month except for limited circumstances).  Mr. Miller is bound by his prior written communications in this matter which are directly contrary to his sworn affidavit.  Specifically, Mr. Miller acknowledged an increased scope of work for the Property (and therefore necessary increases in the guaranteed maximum price of the Design Build contract) as follows:

- "Your cost of carpentry for this job went up by $700k+/- due exclusively to the change from open shop to union subcontractor.  This was owner directed and needs to be addressed as a budget increase.";

- "There was $xxx cost incurred to have the masonry parapet rehabilitated due to the deterioration that led to a potentially dangerous condition with great liability.  This was owner directed, it needed to be done with a firm authenticated as a historic renovation expert and it needs to be addressed as a budget increase to the maximum price.";

- "The seating capacity in the restaurant was increased from 90 seats to 170 seats, at the direction of the owner and operator.  This cost in architectural and mechanical construction values was $1,900,000.  These changes were owner directed, it was desirable to the owner for reasons of enhanced revenue potential and it needs to be addressed as a budget increase to the maximum price."

*See* e-mail from Benjamin Miller to John Lynn, James Jost, and Hal Wheeler, dated February 11, 2009, attached as Exhibit C.  Mr. Miller asked for a letter from Jost confirming such increased scope to the contract.  *Id.*  In the letter responding to Mr. Miller's e-mail of the same day providing the requested information on increased scope of work at the owner's direction, James M. Jost wrote:

"By way of summary:

| | |
|---|---|
| Union Drywall | $796,384.00 |
| Parapet Rehabilitation | $370,496.00 |
| <u>Increased Capacity of Restaurant</u> | <u>$2,000,000.00</u> |
| Total Increase for these three items: | $3,166,880.00" |

3

*See* letter from James M. Jost to Benjamin Miller, dated February 11, 2009, attached as Exhibit D. B&C's architect David Polatnick received Jost's Change Orders No. 1 through 10 on January 30, 2009. *See* Transmittal letter dated January 29, 2009 and confirmation of receipt dated January 30, 2009, attached collectively as Exhibit E. As can be seen through the summary of the change orders, the acknowledged changes by Mr. Miller were contained in Change Orders 1, 2 and 6. *See* Summary of Changes Written 4/30/08 to 12/31/08, attached as Exhibit F. Therefore, at a minimum, Paragraphs 15 and 16 of Benjamin Miller's affidavit are demonstrably false.

In addition, Benjamin Miller, through his company Hospicomm, Inc. surreptitiously obtained a lien on many assets of B&C on March 15, 2010. *See* Hospicomm website and UCC lien filing, dated March 15, 2010, attached collectively as Exhibit G. This lien filing, which shows no evidence of consideration, is a concern and would be subject to review if the order for relief is entered. Benjamin Miller is both a secured creditor with certain self interests and a representative of B&C.

Prior to the filing of the involuntary petition, there were at least three mechanics lien state court actions filed – one by James M. Jost & Co., Inc., one by Clevenger Corporation, and one by Johnson Lumber. In April 2010, B&C declined to produce discovery in the Clevenger Corporation mechanics lien state court action and instead stated that B&C would be filing for bankruptcy soon. *See* Exhibit H. Given the delay tactics exercised by B&C, the failure to comply with the requirements of the state court proceedings, the lien filing of the owner, the deceit regarding additional financing, and the failure to provide any plan for addressing the millions of dollars owed to Jost and the other contractors who performed services for the benefit of B&C, the decision was made to file this involuntary petition.

DB04/839306.0002/2764120.1 PF06

The claims of the Petitioning Creditors as set forth in the Involuntary Petition and the Line adding Clevenger Corporation as a petitioning creditor relate <u>only</u> to the work performed directly for the owner, B&C or as a result of a direct claim against B&C through an acknowledgement of liability and amount owed in the case of Clevenger Corporation.

**II.    LEGAL ARGUMENT**

1.    <u>The Petitioning Creditors all Qualify as Creditors Under 11 U.S.C. § 303(b).</u>

B&C alleges that Dimensional Metals and Klima do not qualify as creditors under § 303(b).  B&C initially ignored Clevenger Corporation in its Motion to Dismiss.  The Petitioning Creditors will briefly address Clevenger's standing as a creditor and reserve their right to respond to the Amended Motion.  For the reasons set forth herein and in the affidavits attached to the Involuntary Petition incorporated herein, all of the Petitioning Creditors qualify under 11 U.S.C. § 303(b).

a.    <u>Klima Electric is a "Creditor" under 11 U.S.C § 303(b).</u>

B&C alleges that Klima cannot possibly qualify as a creditor under 11 U.S.C. § 303(b) because Klima was a subcontractor under Jost and therefore had no direct privity of contract with B&C.  While Klima was a subcontractor under Jost, Klima also provided additional services directly at the request and acknowledgment of B&C.  The invoices that are attached to the affidavit of John Klima with the involuntary petition filing represent work that was requested by the owner or the owner's representative to be placed under separate purchase orders from the original Design Build contract and includes owner directed additional work.  It is only those claims that Klima is using as the basis for its qualification as a "creditor" under the Code.

5

b.  <u>Dimensional Metals is a "Creditor" under 11 U.S.C. § 303(b).</u>

B&C alleges that Dimensional Metals cannot possibly qualify as a creditor under 11 U.S.C. § 303(b) because Dimensional Metals was a subcontractor under Jost and therefore had no direct privity of contract with B&C.  While it is accurate that Dimensional Metals was a subcontractor under Jost, Dimensional Metals also provided additional services directly at the request and acknowledgment of B&C.  The only items related to the main lobby in the Design Build contract were carpeting and furnishings (FF&E).  *See* Exhibit A at ¶ 6.  The work performed by Dimensional Metals was clearly outside the scope of the Design Build contract and was requested by B&C directly.  The invoices attached to the affidavit of Michael Cooke represent work performed directly for B&C for increased scope of work items.  It is only those claims that Dimensional Metals is claiming as the basis for its qualification as a "creditor" under the Code.

c.  <u>Clevenger Corporation is a "creditor" under 11 U.S.C. § 303(b).</u>

Clevenger Corporation has a direct claim against B&C as a result of the letter agreement reached between Clevenger Corporation and B&C.  Specifically, B&C acknowledged and confirmed that the total amount due and earned for two contracts for work at the Property was $817,505.92 and $17,056.14.  *See* Exhibit I.  There is no valid question that Clevenger Corporation holds an undisputed claim in excess of $13,475 against B&C.  This letter is a separate contract in which Clevenger refrained from filing a mechanics lien in return for the promise by B&C to obtain additional funding to pay Clevenger from outside sources.

6

      d.      <u>Jost is a "creditor" under 11 U.S.C. § 303(b).</u>

B&C does not allege that Jost fails to qualify as a "creditor" under 11 U.S.C. § 303(b) and therefore the statements made by Jost in connection with the filing of the involuntary petition are sufficient.

2.      <u>The Claims of the Petitioning Creditors are not Subject to a "Bona Fide Dispute."</u>

B&C alleges that there is a bona fide dispute regarding the claims of Klima, Dimensional Metals, and Jost. Specifically, B&C alleges that any work performed by Klima and Dimensional Metals (other than a few small items) were either within the scope of the Design Build Contract or if the work was outside the scope of the Design Build contract, that it was not authorized by B&C. Mr. Miller, who was not involved in the day to day oversight and supervision at the Property on behalf of B&C is without knowledge to state that B&C did not request or authorize the work for Klima or Dimensional Metals.

B&C correctly states that the Fourth Circuit has held that a bona fide dispute exists when there is "an objective basis for either a factual or a legal dispute as to the validity of the debt." *Schlossberg v. Byrd (In re Byrd)*, 357 F.3d 433, 437 (4th Cir. 2004)(citations omitted). Petitioning Creditors are confident that the Court will find that the "disputes" regarding the Petitioning Creditors claims are not only made up for the purpose of this contested matter but are also at best, subjective.

      a.      <u>Klima's claims are not subject to "bona fide dispute".</u>

Klima performed work directly for B&C that was outside the scope of the Design Build contract and authorized by B&C as stated in the affidavit of John Klima attached to the involuntary petition filing. To make the analysis easier, one can look at two invoices attached to the Klima affidavit: Invoice No. 11057 in the amount of $3,357.50 and Invoice No. 11132 in the

7

amount of $10,984.25.  The total of these two aggregated claims is in excess of the required minimum of $13,475.  The first invoice was authorized by Jack Finney (as stated in the invoice), a representative of Arc Wheeler and B&C, who provided daily development management for B&C.  The work performed was relocating energy meters to the office floors.  This is clearly outside the scope of the Design Build contract.  *See* Exhibit A at ¶ 7.  The second invoice was for work required for a state elevator test involving floors 3 through 6 of the Property which, other than Kimpton's corporate office on the third floor, was outside the scope of the Design Build contract.  *Id.* This work was authorized by the owner's representative.  The "disputes" raised regarding Klima's claims have no objective basis in fact or law.

      b.      <u>Dimensional Metals' claims are not subject to "bona fide dispute."</u>

Dimensional Metals performed work directly for B&C outside the scope of the Design Build contract.  Specifically, Dimensional Metals cleaned and restored the lobby marble, refinished brass doors of the restaurant, pressure washed the sidewalks around the hotel, and repaired the lobby elevator frame on two occasions.  All of this work was outside the scope of the Design Build Contract, was at the request, direction, and authorization of B&C, and is not otherwise the subject of a "bona fide dispute."  *See* Exhibit A at ¶ 8.

      c.      <u>Jost is a holder of a claim in excess of $13,475 against B&C that is not subject to "bona fide dispute."</u>

Jost's claims for general contractor work are complex and detailed.  While valid, and acknowledged in whole and in part by B&C on many occasions, these claims are not essential to the Court's evaluation of Jost's qualification as a holder of a claim in excess of $13,475 that is not subject to a bona fide dispute.

8

    i.  Jost holds a claim in excess of $13,475 as a result of extra work performed for an insurance claim submitted by B&C.

  In addition to the direct claims listed in the Involuntary Petition, upon further review, there is an additional direct claim arising out of an insurance claim made by B&C and work performed directly for B&C by Jost as a result of water damage caused by a Kimpton employee at the Hotel Monaco leaving a water faucet running.  The summary of the accepted insurance claim submitted by B&C is set forth in a "Statement of Loss" attached as Exhibit J.  The "Statement of Loss" includes the following line items related to Jost: "Moldings/trim" in the amount of $4,995.56, "Labor cost" in the amount of $3,364.00, "Union carpenters" in the amount of $4,794.00, "Supervision" in the amount of $1,674.00, and "Overhead" in the amount of $5,542.88.  This totals $20,370.44 submitted by B&C to the insurance company for work performed by Jost directly for B&C outside the scope of the Design Build Contract and accepted as to liability and amount as it was utilized for a payment from the Hartford Insurance Company.  *See* Exhibit A at ¶ 9.  An examination of the invoice submitted by Jost to B&C for the insurance claim is clearly traceable to the amounts B&C submitted for its insurance claim.  *See* Exhibit K.  This claim is separate and apart from the other direct claims listed by Jost in its affidavit in support of the involuntary Petition.  This claim remains unpaid.  *Id.*

    ii.  B&C has not paid amounts due under the Design Build contract.

  B&C requested and obtained funding from Capmark as a result of the increased scope of work and extra costs.  Jost presented B&C with requisitions on a monthly basis that included not only work performed pursuant to the Design Build contract, but also work for the increased scope of the project at the request of ownership.  *See* Exhibit A at ¶ 10.  Accordingly, while B&C paid Jost a monetary amount that is similar to the guaranteed maximum price in the Design Build contract (except for the final payment which is outstanding), this does not mean that B&C

9

paid the amounts currently due and owing under the Design Build contract. James M. Jost never stated that Jost had been paid all amounts currently due and owing to Jost except for the final payment. Jost stated that he wanted Capmark's final payment without acknowledging that Capmark's final payment represented all that was due and owing to Jost. *Id*. As B&C used Capmark funding, in part, for increased scope of work items, the remainder of the work performed under the Design Build contract has not been paid.

      iii.    B&C is estopped from arguing that the Guaranteed Maximum price of the Design Build Contract is a bar to additional amounts owed to Jost.

B&C is estopped from asserting the argument that the Guaranteed Maximum price serves as a bar to additional amounts owed Jost pursuant to the doctrine of equitable estoppel. Equitable estoppel is:

> the effect of the voluntary conduct of a party whereby he is absolutely precluded both at law and in equity, from asserting rights which might perhaps have otherwise existed ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse and who on his part acquires some corresponding right, either of property, of contract, or of remedy.

*Olde Severna Park Improvement Ass'n, Inc. v. Barry*, 982 A.2d 905 (Md.App.,2009) citing *Knill v. Knill*, 510 A.2d 546 (1986).

As discussed above, B&C used requisitions submitted to B&C by Jost to justify draw requests that B&C submitted to Capmark. As a result, not only did B&C acknowledge that there was an increased scope of work on the project, B&C paid for a portion of the increased scope of work through Capmark funding. As B&C has taken direct contrary action by using the increased scope of work as set forth in the Jost requisitions to B&C to obtain funding from Capmark, B&C is estopped from arguing that the guaranteed maximum price in the Design Build contract is a bar to additional amounts due and owing to Jost.

10

B&C also applied for and received increased tax credits from Chevron TCI, Inc., provider of historical tax credits to the project, as a result of the increased scope of work and extra costs. On April 8, 2009, the Reznick Group, acting on behalf of B&C, submitted a chart to Chevron TCI, Inc. that denoted the eligible basis for historic tax credits. *See* Exhibit L. The chart shows several line items that apply to the increased scope of work (not an inclusive list): "Add for restaurant construction, Add for HVAC, Add Electrical." As a result of this letter and chart from Reznick Group, B&C received approximately $1.5 million of additional tax credit funding. *See* Exhibit A at ¶ 11. B&C has taken direct action acknowledging that the guaranteed maximum price of the Design Build contract was not a bar to additional amounts due and owing to B&C. It used Jost's (and its subcontractors) additional work due to the increased scope as the basis for receiving tax credit funding, and now, amazingly, asserts that the additional work was not authorized.

> iv. B&C disingenuously, and without any factual support, alleges that Jost failed to properly pay its subcontractors.

Jost paid its subcontractors properly. In fact, B&C directed Jost on many occasions which subcontractors to pay and how much to pay. *See* Exhibit A at ¶ 12. The fact that there are lien filings speaks to the amounts due and owing from B&C to Jost which would allow for the payment of Jost's subcontractors. At no point in time did Jost agree to fund this project from its own resources. *Id.* There is no basis to determine that there is "an objective basis for either a factual or a legal dispute as to the validity of the debt" based on the baseless speculation of Benjamin Miller.

11

    v.  B&C has no rights to any setoff, recoupment, or counterclaim as a result of the completion of the project.

  The Design Build Contract required substantial completion 300 business days from the commencement of construction. (¶ 3.3 of Design Build Contract). The parties agreed that April 17, 2008 would be the date that construction would commence. *See* Exhibit M. The date for substantial completion therefore was June 19, 2009 pursuant to the terms of the contract. *Id.* On April 28, 2009, Jost received a Certificate of Substantial Completion. *See* Exhibit N. There was no required date for obtaining a Certificate of Completion or a Certificate of Occupancy. A Certificate of Completion was obtained on July 6, 2009. *See* Exhibit O. As a result of the Certificate of Completion, Kimpton employees started their training at the hotel. Certificates of Occupancy were obtained on July 23, 2009 and July 29, 2009. *See* Certificates of Occupancy, attached collectively as Exhibit P. There can be no dispute that Jost met the terms of the Design Build contract and therefore there are no damages arising out of "late completion."

  WHEREFORE, for the foregoing reasons the Petitioning Creditors request that the Court:

  a.  Deny the Motion to Dismiss the Involuntary Petition;

  b.  Grant such other and further relief as the Court deems appropriate.

Dated: May 14, 2010        Respectfully submitted,

                /s/ Lawrence P. Block
                Lawrence P. Block, No. 12580
                Janet M. Nesse, No. 25884
                Stinson Morrison Hecker LLP
                1150 18th St., N.W., Suite 800
                Washington, DC 20036
                Tel. (202) 785-9100; Fax. (202) 572-9993
                lblock@stinson.com

                *Counsel for Petitioning Creditors*